**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF OHIO**
**WESTERN DIVISION**

**JOHN DOE, et al.,**

     **Plaintiffs,**

                             **Case No. 1:20-cv-688**
     **v.**                     **JUDGE DOUGLAS R. COLE**

**BMG SPORTS, LLC, d/b/a**
**AMERILEAGUES AND**
**CINCINNATI PREMIER YOUTH**
**VOLLEYBALL LEAGUE, et al.,**

     **Defendants.**

## OPINION AND ORDER

This cause comes before the Court on Defendants Mariemont City School District, Steven Estepp, and Lance Hollander's (collectively "School Defendants") Motion to Dismiss ("School Motion," Doc. 10), filed on November 19, 2020. Plaintiffs John Doe and W.W.[1] filed their Opposition (Doc. 17) on February 10, 2021, and the School Defendants filed a Reply (Doc. 20) on February 18, 2021.

Also before the Court is John Doe and W.W.'s February 3, 2021, Motion to Dismiss ("Doe Motion," Doc. 16) Defendants Cincinnati Premier Youth Volleyball League ("CPYVL") and Ben Goodyear's Counterclaims (Doc. 13). CPYVL and Goodyear (collectively the "League Defendants") filed their Opposition (Doc. 21) on February 23, 2021. John Doe and W.W. did not file a reply.

---

[1] Plaintiffs in this case seek to proceed pseudonymously in order to protect W.W.'s identity as a minor child. (Compl., Doc. 1, #5).

For the reasons stated more fully below, the Court **GRANTS** both Motions to Dismiss (Doc. 10, Doc. 16).

## FACTUAL BACKGROUND

For the purposes of analyzing the parties' competing Motions to Dismiss, the Court accepts as true the factual allegations in Doe's Complaint[2] (as to the School Defendants' Motion to Dismiss) and in the League Defendants' counterclaims (as to Doe's Motion to Dismiss). Thus, the Court reports and relies on those allegations here, but with the disclaimer that these facts are not yet established—and may never be.

**A.    The Facts Underlying The School Defendants' Motion To Dismiss.**

The claims and counterclaims at issue here all arise out of activities that occurred at a school building in the Mariemont City School District ("School District" or "District"). The District is located on the east side of Cincinnati, Ohio, and includes students from the villages of Fairfax, Mariemont, and Terrace Park, as well as from the unincorporated areas of Plainville and William Meadows. (Compl., Doc. 1, #6[3]). It is headed by the Mariemont Board of Education ("Board of Education" or "Board"). There are two elementary schools in the District, one junior high school, and one high school. (*Id.* at #6–7).

Under Ohio law, the Board of Education is required to make its facilities available to private organizations and groups wishing to use its facilities "as social

---

[2] Doe brings this case both on his own behalf as well as on W.W.'s behalf as her next friend. (Compl., Doc. 1). However, for the sake of brevity, the Court occasionally omits W.W.'s name in describing pleadings and briefings filed by John Doe and W.W. collectively.

[3] Refers to PAGEID #.

centers for the entertainment and education of the people." Ohio Rev. Code § 3313.76. Consistent with this obligation, the District entered into an agreement with one of the co-defendants in this case: the Mariemont Recreation Association ("MRA"). (*Id.* at #8). The MRA is a private, formerly incorporated,[4] nonprofit organization that organizes youth sports for students enrolled in Mariemont's two elementary schools. (*Id.* at #7). One activity that the MRA offers is a youth volleyball team. (*Id.* at #8). In operating this team, the MRA has contracted with CPYVL, another co-defendant, and a vendor that matches the MRA's teams with opponents, schedules the dates and times of games, and sends referees to officiate those games. (*Id.* at #7).

Plaintiff W.W. participated in the MRA's youth volleyball programming. (*Id.* at #3). At the time of the incident giving rise to this litigation, September 23, 2018, W.W. was a fourth-grade student at Mariemont Elementary School. (*Id.* at #10–11). That day, W.W. and her team were playing a game against another CPYVL team at Mariemont Junior High School. (*Id.* at #11). W.W.'s father, John Doe, was present and assisting as a volunteer score board operator. (*Id.*).

CPYVL supplied the referee for the game. He was an as-yet unidentified man in his 50s. (*Id.* at #3, 11). According to Doe, both before and during the game, Doe heard the referee make a series of offensive and sexualizing remarks about the female elementary school players. (*Id.* at #11).

---

[4] "In 2010, the MRA filed articles of incorporation as a nonprofit corporation with the State of Ohio. In 2015, the State canceled those articles of incorporation following the MRA's failure to file a statement of continued existence." (Compl., Doc. 1, #7).

Disturbed by the referee's conduct, Doe contacted W.W.'s coaches after the game. The coach told Doe that a complaint against the referee already had been filed. (*Id.*). A few days later, one of the coaches contacted Doe and informed him that the referee "ha[d] been removed from the entire reffing board." (*Id.* at #12).

Doe remained concerned, though, that the referee still posed a threat to W.W. and her teammates. (*Id.* at #13). Accordingly, he reached out to the MRA to obtain the referee's name and to urge the organization to contact the parents of a player who had been specifically targeted by the referee's conduct. (*Id.*). Unable to obtain the name of the referee through the MRA and dissatisfied with the organization's response to the incident, Doe took numerous steps. (*Id.* at #13–14). In addition to filing a police report, he also contacted defendant Ben Goodyear, head of the CPYVL; the principal of W.W.'s elementary school; and the principal of the junior high school[5] where the incident took place. (*Id.* at #15–16). Doe was never able to obtain the referee's name, and "as the Fall 2018 volleyball season wound down, [he] had few answers as to how the Mariemont School District, the MRA and the CPYVL planned to keep children safe from the referee and other adults who may have illicit motives in working with juveniles." (*Id.* at #17).

The following year, in summer 2019, Doe registered W.W. for the MRA/CPYVL's upcoming fall volleyball season. (*Id.*). Soon thereafter, the MRA

---

[5] Doe's Complaint describes this individual, Molly Connaughton, as "the former principal of the Mariemont Junior High School[.]" (Compl., Doc. 1, #16). It is not clear from the Complaint if Doe means that Connaughton had already left this position by the time he spoke with her, or if he means that she was in this position when he spoke with her, but has since stepped down.

4

emailed Doe to inform him that he was banned from attending any CPYVL events. (*Id.* at #18). When Doe attempted to follow-up with the MRA, he was directed to CPYVL's head, Ben Goodyear, who refused to explain the basis for the ban or what rules Doe had broken. (*Id.* at #19).

Approximately a week later, Doe met with Lance Hollander, the School District's Director of Administrative Services. (*Id.* at #20). While Hollander agreed that "there had been no process afforded, no basis provided for the ban, [and] no end date to [the] ban," he stated that he did not want to contact the MRA for fear that the ban would be extended to W.W. as well. (*Id.*). Hollander later contacted Doe to inform him that the MRA had been unable to give him a reason for the ban. (*Id.*).

Doe then scheduled a meeting with School Superintendent Steven Estepp. (*Id.*). During this meeting, Estepp told Doe that he had concluded this was "not a matter worthy of [his] time" because no other parents had complained. (*Id.* at #21). Estepp then declined to investigate the ban "and disputed that it might have been imposed for any unlawful reason, while simultaneously asserting that he did not know the basis for the ban." (*Id.*). Estepp also "expressed concern over the impact any investigation into the MRA's affiliation with Goodyear's leagues might have on current youth sports in the School District." (*Id.*). When Doe discussed the possibility of going to the School Board, Estepp told him the Board "would not care." (*Id.* at #22).

Nonetheless, on October 24, 2019, Doe met with the Board's President and Vice President. (*Id.* at #24). The President and Vice President argued that the issue "was

not a district matter" and denied knowing the reason for the ban; they also refused Doe's request for a hearing. (*Id.*).

The next day, Doe emailed Goodyear, writing that "in the absence of any explanation as to what rules had been broken, the only reasonable conclusion was that the ban was in retaliation for [Doe's] October 2018 police report." (*Id.* at #25). In response, "Goodyear permanently suspended W.W. from all sports programs he manages." (*Id.*).

After receiving notice that the ban had been extended to W.W. as well as himself, Doe contacted District and MRA officials to request a hearing. (*Id.* at #26). Doe states that the District never responded, although it is unclear as to whether he ever heard back from the MRA. (*Id.*). When Doe attempted to enroll W.W. in a series of spring volleyball clinics, the MRA stated that W.W. could attend practice, but could not attend any activities (including games and tournaments) operated by CPYVL. (*Id.*).

On September 2, 2020, Doe filed his Complaint (Doc. 1) in this case, asserting various claims against CPYVL, CPYVL Head Goodyear, the School District, District Superintendent Estepp, District Director of Administrative Services Hollander, the MRA, and MRA President Gregory Spreen.

On November 19, 2020, the School Defendants moved to dismiss all claims against them. These include claims against Estepp and Hollander for intentional infliction of emotional distress, violation of 42 U.S.C. § 1983, and violation of the Ohio Constitution, as well as claims against the School District for breach of contract,

6

violation of the Ohio Constitution, violation of Title IX, and violation of 42 U.S.C. § 1983.

**B.    The Facts Underlying Doe's Motion To Dismiss.**

In addition to the School Defendants' Motion to Dismiss, the League Defendants have also asserted counterclaims against Doe generally arising out of these same events. According to the League Defendants, when Doe signed W.W. up for the volleyball league, he (or his representative) electronically signed the CPYVL Parent/Spectator Code of Conduct (the "Code of Conduct"). By signing the Code of Conduct, Doe agreed, in pertinent part, "not [to] engage in physically or verbally abusive conduct. If I do, I will be subject to discipline up to a lifetime ban from all League games and activities." (Counterclaim, Doc. 13, #88). Moreover, the Code of Conduct also included an indemnification clause, in which Doe agreed to

> indemnify, defend, and hold harmless the CPYVL (and its officers, directors, employees, members, and agents) from and against any and all, actual or threatened, third party claims, liabilities, losses, damages, injuries, or expenses (including reasonable attorney's fees) directly or indirectly arising from or relating to … any breach by me of the terms of this agreement[.]

(*Id.*).

The League Defendants argue that Doe and W.W. were banned from the League not because Doe reported the offensive referee, but because Doe engaged in a multi-month campaign of "harassment and threatening conduct" against CPYVL. (*Id.* at #70). In continuing with this behavior, CPYVL alleges, Doe was in breach of the Code of Conduct. And, as a result of Doe's lawsuit, the League Defendants allege that they are now "suffering damages, costs, and fees, and continue to incur damages in

the form of costs and attorneys' fees and loss of time in order to deal with and defend this matter for [Doe's] violation of the Code." (*Id.* at #90). Accordingly, the League Defendants seek to have the indemnification clause enforced and request whatever costs, attorneys' fees, and other relief the Court deems appropriate. (*Id.* at #91).

## LEGAL STANDARDS

At the motion to dismiss stage, a complaint (or counterclaim) must "state[] a claim for relief that is plausible, when measured against the elements" of a claim. *Darby v. Childvine, Inc.*, 964 F.3d 440, 444 (6th Cir. 2020) (citing *Binno v. Am. Bar Ass'n*, 826 F.3d 338, 345-46 (6th Cir. 2016)). "To survive a motion to dismiss, in other words, Plaintiffs must make sufficient factual allegations that, taken as true, raise the likelihood of a legal claim that is more than possible, but indeed plausible." *Id.* (citations omitted).

In making that determination, the Court must "construe the complaint [or counterclaim] in the light most favorable to the plaintiff [or counterclaimant], accept its allegations as true, and draw all reasonable inferences in favor of the plaintiff [or counterclaimant]." *Bassett v. Nat'l Collegiate Athletic Ass'n*, 528 F.3d 426, 430 (6th Cir. 2008) (internal quotation marks omitted). That is so, however, only as to factual allegations. The Court need not accept as true any legal conclusions alleged in a complaint (or counterclaim). *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007)). Moreover, the well-pled facts must be sufficient to "raise a right to relief above the speculative level," such that the asserted claim is "plausible on its face." *Iqbal*, 556, U.S. at 678; *Twombly*, 550 U.S. at

8

546–47. Under the *Iqbal/Twombly* plausibility standard, courts play an important gatekeeper role, ensuring that claims meet a threshold level of factual plausibility before defendants are subjected to the potential rigors (and costs) of the discovery process. Discovery, after all, is not meant to allow parties to discover whether a claim in fact exists, but rather to provide a process for gathering evidence to substantiate an already plausibly-stated claim. *Green v. Mason*, 504 F. Supp. 3d 813, 827 (S.D. Ohio 2020).

## SCHOOL DEFENDANTS' MOTION TO DISMISS

In his Complaint, Doe brings claims against the School Defendants for, variously, breach of contract, intentional infliction of emotional distress ("IIED"), violation of the Ohio State Constitution, violation of Title IX, and 42 U.S.C. § 1983. The Court addresses each of these claims in turn.

### A. Doe Fails To Allege A Plausible Breach Of Contract Claim.

Doe alleges that the School District is liable for breach of contract. (Compl., Doc. 1, #30). More specifically, Doe's Complaint states that "[he] entered into a contract with Defendants Mariemont City School District, Mariemont Recreation Association, and [MRA President] Gregory Spreen to provide coaching, instruction, practice, and game opportunities for his daughter to play volleyball." (*Id.*). Thus, Doe argues that, by ratifying CPYVL's ban on W.W. and himself, the School District and its co-defendants are in breach.[6]

---

[6] In his Opposition, Doe also appears to argue that W.W. is bringing a separate breach of contract claim as the intended third-party beneficiary of the contract between the MRA and the School District that allowed the MRA to use school facilities. (Doc. 17, #113–14). But Doe

The School District responds that Doe's breach of contract claim must be dismissed because he "failed to attach [the alleged] contract to the Complaint. Moreover, [Doe] … failed to quote the terms of the contract upon which this claim is based." (School Mot., Doc. 10, #55). Effectively, the School District argues that, because Doe has not properly put it on notice of what terms of the contract it allegedly violated, his claim should be dismissed. The Court agrees.

As the Sixth Circuit has explained, "[i]t is a basic tenet of contract law that a party can only advance a claim of breach of written contract by identifying and presenting the actual terms of the contract allegedly breached." *Northampton Rest. Group., Inc. v. FirstMerit Bank, N.A.*, 492 F. App'x 518, 522 (6th Cir. 2012) (quoting *Harris v. American Postal Workers Union*, No. 98-1734, 1999 WL 993882, at *4 (6th Cir. Oct. 19, 1999) (per curiam)); *see also Foster v. Health Recovery Servs.*, 493 F. Supp. 3d 622, 640 (S.D. Ohio 2020) (observing that "[t]he Sixth Circuit does not permit a party to allege, in a cursory manner, the existence of a contract without citing to specific language that was allegedly breached"). In this case, Doe has not pointed to any specific language in the purported contract between himself and the School District, and that failure is fatal to his breach of contract claim.

Moreover, to the extent Doe presents any specific factual allegations supporting the inference that a contract existed here, it does not appear that the

---

does not allege this breach of contract claim in his Complaint. (Compl., Doc. 1, #30–31). Consequently, to the extent that Doe attempts to bring this new breach of contract claim in his Opposition to the School Defendants' Motion, this claim must be dismissed. *Fennell v. Univ. of Akron,* No. 5:06-cv-2883, 2007 WL 2236601, at *2 (N.D. Ohio July 31, 2007) ("[A] [p]laintiff may not implicitly amend his complaint by simply asserting new claims in opposition to a dispositive motion.").

School District was—in fact—party to it. Doe's Complaint states: "[Doe] registered W.W. to play volleyball for the Fall 2019 season *through the MRA*. [Doe] registered W.W. on July 11, 2019 and received notification *from the MRA* that day that his credit card payment had been processed and that W.W.'s registration had been paid in full." (Doc. 1, #17 (emphasis added)). Although these facts may support the inference that Doe had a contract with the MRA, they do not support the inference that the School District, as an independent entity, was also party to this contract. (*See id.* at #8). Accordingly, Doe's breach of contract claim against the School District must be dismissed.

**B.      The Court Dismisses The IIED Claims Against Estepp And Hollander.**

Next, the Court addresses Doe's intentional infliction of emotional distress ("IIED") claims against Estepp and Hollander. Doe alleges, in essence, that because Estepp and Hollander "ratified" the ban, and W.W. and Doe suffered emotional distress as a result of that ban, Plaintiffs have stated a viable claim for IIED under Ohio law against the two. (*Id.* at #29–30). The Court disagrees.

In order to prove an IIED claim in Ohio, a plaintiff must show that "(1) defendants intended to cause emotional distress, or knew or should have known that their actions would result in plaintiff's serious emotional distress, (2) defendants' conduct was extreme and outrageous, (3) defendants' actions proximately caused plaintiff's emotional injury, and (4) plaintiff suffered serious emotional anguish." *Smith v. City of Toledo*, 13 F.4th 508, 521 (6th Cir. 2021) (quoting *Miller v. Currie*, 50 F.3d 373, 377 (6th Cir. 1995)).

The Court need not analyze Doe and W.W.'s IIED claims in light of each of these factors, however, because even assuming Doe has adequately alleged elements one through three, his claim fails at element four: a showing of serious emotional anguish. Under Ohio law, "serious emotional anguish" is an exacting standard. As the Sixth Circuit recently observed, this

> requirement "describes emotional injury which is both severe and debilitating. Thus, serious emotional distress may be found where a reasonable person, normally constituted, would be unable to cope adequately with the mental distress engendered by the circumstances of the case." Examples "include traumatically induced neurosis, psychosis, chronic depression, or phobia."

*180 Indus., LLC v. Brunner Firm Co. LPA*, No. 20-4129, 2021 WL 4955268, at *2 (6th Cir. July 13, 2021) (internal citation omitted) (quoting *Paugh v. Hanks*, 451 N.E.2d 759, 765 (Ohio 1983)).

Here, Doe fails to provide sufficient factual allegations to meet this demanding standard. In the Complaint, Doe states only that he and W.W. "have suffered serious psychological injury as a result of the permanent ban imposed by these Defendants." (Doc. 1, #29). But without factual specificity explaining *how* Doe and W.W. "suffered serious psychological injury" in a manner so extreme that they are "unable to cope," this claim cannot survive. *See, e.g.*, *Swartz v. Di Carlo*, No. 1:12-cv-3112, 2015 WL 1022073, at *7 (N.D. Ohio Mar. 6, 2015) (rejecting plaintiffs' claims generically alleging "severe emotional distress" because there were no supporting "allegation[s] of medical treatment, phobia, severe loss of the ability to eat, sleep[,] work, etc[.] … In short, there [was] no factual allegation to support this element …."). Doe and

W.W.'s IIED claims against Estepp and Hollander fall short of federal pleading standards and, accordingly, the Court dismisses those claims.

## C. The Court Dismisses The Ohio State Constitutional Claims Against The School Defendants.

Doe also asserts claims against the School Defendants for violating multiple rights allegedly guaranteed under Ohio's Constitution, including due process, equal protection, and freedom of speech. (Compl., Doc. 1, #28–29). Doe's Complaint, however, does not point to the specific provisions of the Ohio Constitution that he argues enshrines these rights. (*See id.*).

The School Defendants respond that, as a general rule, the Ohio Supreme Court has "not recognized the existence of a private cause of action for damages under the Ohio Constitution," and "a provision under the Ohio Constitution only creates a private right of action if it is self-executing." (School Mot., Doc. 10, #58). The School Defendants then argue that any provisions of the Ohio Constitution potentially directed at the rights allegedly infringed in this case are not self-executing. (*Id.* at #58–59). Thus, the School Defendants argue, relief is not available under the Ohio Constitution and Doe's state constitutional claims fail as a matter of law. (*Id.*).

Doe's Opposition does not respond to the School Defendants' Motion to Dismiss with regard to his state constitutional claims, and "for this reason the claim[s are] deemed waived." *Jones v. Nationstar Mortg. LLC*, No. 14-11642, 2014 WL 5307168, at *7 (E.D. Mich. Oct. 16, 2014) (citing *Brown v. VHS of Mich., Inc.,* 545 F. App'x 368, 372 (6th Cir. 2013)). Accordingly, the Court dismisses Doe's state constitutional claims against the School Defendants.

13

**D.     Plaintiffs Have Not Stated A Plausible Title IX Claim.**

Doe also alleges that the School District is liable under Title IX. (Compl., Doc.

1, #31). But, because the supporting allegations fail to place the School District on

notice of the basis of Doe's claim as Fed. R. Civ. P. 8(a) requires, this claim must be

dismissed.

After readopting and incorporating by reference the previous paragraphs of his

Complaint, Doe's Title IX claim reads, in its entirety:

> [the] School District receives Title IX funding. Compliance with Title IX
> of the Education Amendments of 1972 is a requirement of any public
> school district that receives federal funds. [The District] failed to heed
> its Title IX obligations. W.W. is entitled for damages for [the District's]
> failure to heed its Title IX obligations

(*Id.* (paragraph numbering omitted)).

These allegations amount to little more than that (1) the School District *has*

Title IX obligations, and (2) the District "failed to heed" these obligations. (*Id.*). Such

bare-bones and legally conclusory allegations are insufficient to survive a motion to

dismiss. As the Supreme Court has explained, a complaint must provide "more than

an unadorned, the-defendant-unlawfully-harmed-me-accusation." *Ashcroft v. Iqbal*,

556 U.S. 662, 678 (2009). Here, Doe has made no effort to explain the obligations he

believes Title IX to impose, or how he believes the School District violated that

provision. Consequently, this claim must be dismissed.

**E.     The Court Dismisses The § 1983 Claims Against The School
        Defendants.**

Finally, Doe alleges that the School Defendants are liable under 42 U.S.C.

§ 1983. Section 1983 does not create any substantive rights, but rather provides a

14

vehicle for remedying violations of other rights. More specifically, § 1983 allows a party to bring "an action at law, suit in equity, or other proper proceeding for redress," against any "person who, under color of [state law]" deprives the party of any rights "secured by the Constitution and [federal] laws." 42 U.S.C. § 1983. In other words, to succeed in a § 1983 action, the plaintiff must plead facts plausibly showing that a defendant violated a right bestowed on the plaintiff by federal law, and that the defendant did so while acting "under color of" state law.

Doe asserts that the School Defendants are liable because they "ratif[ied] the ban on W.W.'s participation [in the volleyball league] and John Doe's presence [at league events]," which in turn violated Doe and W.W.'s constitutional rights to substantive due process, procedural due process, and freedom of speech. (Compl., Doc. 1, #27–28). The Court concludes that such allegations fall short of establishing a plausible § 1983 claim.

To start, the Court rejects Doe's conclusory allegation that the School Defendants "ratified" the ban, as that allegation is inconsistent with Doe's other factual allegations. In his Complaint, Doe explains the School Defendants, including Estepp, Hollander, and representatives of the School Board, were each made aware of the ban and declined to intervene to assist W.W. and Doe. (*Id.* at #20–24). But as the Sixth Circuit has explained, "[r]atification of a subordinate's action requires more than acquiescence—it requires affirmative approval of a particular decision made by a subordinate." *Liptak v. City of Niles*, No. 98-4078, 1999 WL 1045100, at *6 (6th Cir. Nov. 10, 1999) (quoting *Feliciano v. City of Cleveland*, 988 F.2d 649, 656 (6th Cir.

1993)). In other words, the Sixth Circuit distinguishes between affirmative approval and passive acquiescence.[7] While the former is sufficient to demonstrate ratification, the latter is not.

Doe's problem is that he never alleges that any of the School Defendants affirmatively *approved* the ban—only that they were aware of it and did nothing to help. Accordingly, although Doe may have alleged sufficient facts to create a plausible inference that the School Defendants acquiesced to the ban, he has not adequately alleged that they ratified it.

This presents a problem for Doe, however, as § 1983 claims generally cannot be premised on a state actor's passive acquiescence to the violation of the rights of freedom of speech and due process by private parties. With regard to freedom of speech, the Sixth Circuit has observed that First Amendment protections "are triggered only in the presence of state action and … a private entity acting on its own cannot deprive a citizen of First Amendment rights." *Lansing v. City of Memphis,* 202 F.3d 821, 828 (6th Cir. 2000) (citing *Flagg Brothers Inc. v. Brooks*, 436 U.S. 149, 156 (1978)). Similarly, with regard to due process, the Sixth Circuit recently explained

---

[7] Things may change in terms of § 1983 liability if a plaintiff alleges acquiescence in a *pattern* of misconduct by a subordinate. *See Woodall v. Wayne Cnty.*, No. 20-1705, 2021 WL 5298537, at *6 (6th. Cir. Nov. 15, 2021). In other words, if a party has knowledge of a subordinate's ongoing pattern of misconduct, and elects not to intervene, that can in some circumstances give rise to liability for the party under § 1983. Even then, though, the liability is typically discussed in terms of unconstitutional inaction, rather than ratification. And, in any event, there are at least two problems with any such theory here. First, there are no allegations of a pattern of misconduct—just the two decisions here banning W.W. and Doe. *See Thomas v. City of Chattanooga,* 398 F.3d 426, 434 (6th Cir. 2005) (observing that a plaintiff must "reach beyond the facts of this case to show any possibility of a pattern"). Second, such theories are typically applied to claims involving misconduct by employees or subordinates, and the party who engaged in the alleged misconduct here was not an employee or subordinate of the School Defendants.

16

that "nothing in the language of the Due Process Clause itself requires the State to protect the life, liberty, and property of its citizens against invasion by private actors." *M.J. v. Akron City Sch. Dist. Bd. of Educ.,* 1 F.4th 436, 448 (6th Cir. 2021) (quoting *DeShaney v. Winnebago Cnty. Dep't of Soc. Servs.*, 489 U.S. 189, 195 (1989)). This is true even if the State has knowledge "of the individual's predicament." *DeShaney,* 489 U.S. at 200. For example, in *Engler v. Arnold,* the Sixth Circuit found that a child services official could not be held liable under § 1983 when a child was killed by his abusive stepfather, even though the official had received reports about the abuse and declined to investigate it. 862 F.3d 571, 576 (6th Cir. 2017).

While the facts here are different from, and less egregious than, the conduct in *Engler*, Doe's § 1983 claims rest on the same notion. Namely, he alleges that government officials—here, the School Defendants—were aware of private parties' course of conduct, but failed to do anything to investigate or stop it. In other words, he alleges that the School Defendants failed to protect him. Not surprisingly, then, Doe's claim fails for the same reason that claim in *Engler* did: "a plaintiff seeking to hold a state official liable for private acts must allege more than a failure to act." *Engler*, 862 F.3d at 575 (citing *Cartwright v. City of Marine City*, 336 F.3d 487, 493 (6th Cir. 2003)). As Doe does not allege that the School Defendants had any role in instituting the ban, nor does he allege that they took any steps to help enforce it, his § 1983 claim against the School Defendants based on their failure to act fails as a matter of law.[8]

---

[8] There are two recognized exceptions to the "state action" requirement in § 1983 claims. "The first exception is when a special relationship exists between the state and the private

17

Admittedly, the Court's conclusion on this front turns on CPYVL, Goodyear, and the MRA in fact being private actors. If Doe could show that, although the MRA, CPYVL, and Goodyear were not government institutions or employees, they were still state actors for the purposes of § 1983 liability, that would complicate the analysis. And, to be fair, while Doe never offers this argument directly, he perhaps gestures in that direction—at least with regard to the MRA—by arguing that it operated as the School District's "agent," and by asserting § 1983 claims (which run only against state actors) against the organization itself. (Compl., Doc. 1, #7, 27).

But, if Doe in fact means to argue that the Court should consider the MRA a "state actor" for the purposes of the § 1983 analysis, his argument is unavailing. To be sure, Doe is right that a party need not be a government employee or institution to be considered a "state actor" for the purposes of § 1983. *See, e.g.*, *Lansing,* 202 F.3d at 828. But in order to establish that a non-government institution or employee was nonetheless a "state actor," a party cannot rely on mere conclusory assertions that this individual or entity was the government's agent, as Doe attempts to do in his Complaint. (Doc. 1, #27). Rather, the Sixth Circuit has "recognized four tests to determine whether a private party's challenged conduct is fairly attributable to the State: (1) the public function test; (2) the state compulsion test; (3) the symbiotic

---

individual due to the state's significant restraint on that individual's personal liberty." *Sexton v. Cernuto,* 18 F.4th 177, 186 (6th Cir. 2021) (internal citations and quotation marks omitted). This is plainly inapplicable to Doe's claims. "The second exception—the state created danger doctrine—applies when the state takes an affirmative act that increases the victim's risk of harm from private acts of violence." *Id.* (internal citations and quotation marks omitted). Because Doe's § 1983 claims in this case do not relate to acts of private violence, this exception is also inapplicable.

relationship or nexus test; and (4) the entwinement test." *Snodgrass-King Pediatric Dental Assocs., P.C. v. DentaQuest USA Ins. Co.*, 780 F. App'x 197, 204 (6th Cir. 2019) (quoting *Marie v. Am. Red Cross*, 771 F.3d 344, 362 (6th Cir. 2014)).

Three of the four—the public function test, the state compulsion test, and the entwinement test—are non-starters based on Doe's factual allegations. First, "under the public function test, the court conducts a historical analysis to determine whether the party has engaged in an action traditionally reserved to the state." *Marie*, 771 F.3d at 362. Doe has not, and cannot, plausibly allege that a community volleyball team is an activity "traditionally reserved to the state," thus, the public function test does not apply.

Next, the state compulsion test requires that a state "exercise such coercive power or provide such significant encouragement, either overt or covert, that in law the choice of the private actor is deemed to be that of the state." *Reguli v. Guffee*, 371 F. App'x 590, 600 (6th Cir. 2010). That test does not apply because Doe has not alleged that any state officials compelled the private actors to institute the ban—only that the state actors failed to investigate that ban.

Third, as for the entwinement test, "[t]he crucial inquiry … is whether the 'nominally private character' of the private entity is 'overborne by the pervasive entwinement of public institutions and public officials in its composition and workings [such that] there is no substantial reason to claim unfairness in applying constitutional standards to it.'" *Vistein v. Am. Registry of Radiologic Technologists*, 342 F. App'x 113, 129 (6th Cir. 2009) (quoting *Brentwood Acad. v. Tenn. Secondary*

*Sch. Athletic Ass'n*, 531 U.S. 288, 298 (2001)). Again, Doe's claims plainly fail to satisfy the entwinement test, because Doe has not alleged that *any* school district officials are involved with the MRA's composition and workings.

Doe makes a slightly stronger case under the nexus test, but even so his allegations are insufficient to plausibly allege that the MRA was a state actor under this theory. "Under [the nexus] test, the action of a private party constitutes state action when there is a sufficiently close nexus between the state and the challenged action of the regulated entity so that the action of the latter may be fairly treated as that of the state itself." *Partin v. Davis,* 675 F. App'x 575, 585 (6th Cir. 2017) (internal quotation marks omitted).

Although Doe never directly addresses the nexus test in his Complaint or his briefing, he offers various factual assertions that could factor into a nexus analysis. For example, he states that the MRA youth volleyball team plays in school facilities under an agreement with the School District, (Compl., Doc. 1, #20), that the MRA's volleyball coach coordinates her training plan with the School District's junior high coaches to prepare its players for junior high volleyball, (*id.* at #18), and that the MRA's players wear jerseys in the School District's colors.[9] (*Id.* at #3).

But while these are all valid factors for the Court to consider in conducting the nexus analysis, they are not—either individually or collectively—sufficient to satisfy it here. Indeed, in *Lansing v. City of Memphis*, the Sixth Circuit found, as a matter of

---

[9] In his Complaint, Doe also states that these jerseys include the school's name. (Doc. 1, #3). However, in photos of the jerseys included in the Complaint, the jerseys only say "Mariemont," rather than "Mariemont Elementary." (*Id.* at #10, 18).

law, that a non-profit corporation operating a music festival on city property did not satisfy the nexus test, despite the much stronger set of facts the plaintiffs marshalled in their favor in that case. 202 F.3d at 834. Like here, the alleged "state actor" in *Lansing* also operated on government property, coordinated with government officials, and conferred a substantial benefit on its government partner (albeit an economic benefit, rather the training/educational benefits the MRA confers on the School District). *Id.* at 831–33. But unlike here, the alleged "state actor" in *Lansing* also received public funding and had public officials on its board. *Id.* Nonetheless, in *Lansing* the Sixth Circuit found that the plaintiffs failed to satisfy the nexus test. *Id.* at 834. Given that the connections between the MRA and the School District here are weaker than they were in *Lansing,* the Court finds that the MRA was not a state actor for the purposes of § 1983.

Accordingly, because the Court finds Doe's § 1983 claims are based entirely on the School Defendants' failure to protect him and W.W. from the MRA, CPYVL, and Goodyear's private conduct, these claims—as with all of Doe and W.W.'s claims against the School Defendants—must be dismissed.[10]

---

[10] To address one final wrinkle: in their Motion, the School Defendants correctly note that the School District is not the properly named defendant in this case. (Doc. 10, #54). As this Court has recognized, "under Ohio law, a school district 'does not exist and is not sui juris.'" *Estate of Olsen v. Fairfield City Sch. Dist. Bd. of Educ.*, 341 F. Supp. 3d 793, 799 (S.D. Ohio 2018) (quoting *Mahdy v. Mason City Sch. Dist.*, No. 1:16-cv-845, 2017 WL 25504, at *2 (S.D. Ohio Jan. 3, 2017). Rather, "the board of education of the school district … is the body politic and corporate which is capable of suing and being sued." *Id.* (citing *Mahdy*, 2017 WL 25504, at *2, in turn citing Ohio Rev. Code § 3313.17).

In response to that argument, in his Opposition, Doe requests leave from the Court to add the School Board as a defendant. As an initial matter, the Court cannot consider that request because Doe failed to file a motion for leave to amend. *La. Sch. Emps. Ret. Sys. v. Ernst & Young, LLP*, 622 F.3d 471, 486 (6th Cir. 2010) ("A request for leave to amend almost as an aside, to the district court in a memorandum in opposition to the defendant's motion to

## DOE'S MOTION TO DISMISS THE LEAGUE DEFENDANTS'
## COUNTERCLAIMS

The Court also addresses Doe's Motion to Dismiss the League Defendants' counterclaims against himself and W.W. (Doc. 16). For the reasons stated more fully below, Doe's Motion to Dismiss is **GRANTED**.

As noted above, the League Defendants' Counterclaim is held to the same pleading standard that applies to a Complaint. *Am. City Bus. Journals, Inc. v. Parshall*, No. 2:17-cv-596, 2018 WL 4599843, at *1 (S.D. Ohio Sept. 25, 2018). Accordingly, while the Court accepts all the League Defendants' factual allegations as true and draws all reasonable inferences in their favor, they must still plead sufficient facts to "raise a right to relief above the speculative level," such that their counterclaims are "plausible on [their] face." *Iqbal*, 556, U.S. at 678; *Twombly*, 550 U.S. at 546–47.

In this case, the relief the League Defendants seek under the indemnity clause of the Code of Conduct is predicated on Doe's breach of contract. In evaluating breach of contract claims at the Motion to Dismiss stage, the Sixth Circuit has observed that it is not merely enough for a non-moving party to allege that a contract was breached. *Derbabian v. Bank of Am., N.A.*, 587 F. App'x 949, 954 (6th Cir. 2014). Rather, the complaint or counterclaim must provide "further explanation, including the relevant terms of the [] agreement, how the agreement was breached, and how the breach harmed the [non-moving party]." *Id.* For example, in *Carthartt, Inc. v. Innovative*

---

dismiss is … not a motion to amend.") (internal quotation marks omitted). In any event, the issue is moot because substituting the School District with the School Board as the named defendant would not cure the issues the Court has identified in this Opinion.

*Textiles, Inc.*, the court dismissed a breach of contract claim in part because the allegations were not "sufficiently specific." 323 F. Supp. 3d 917, 923 (E.D. Mich. 2018). In that case, the plaintiff alleged that the defendant had breached its contractual obligation to "dye, treat, finish, and test," the plaintiff's fabric because all of the fabric the defendant serviced "was defective." *Id.* The Court dismissed this claim, finding that the complaint was too vague to "apprise [the defendant] of what it did to cause the fabric to be defective, or even if the defect was caused by GMI's services." *Id.*

Here, the League Defendants' Counterclaim similarly fails for lack of explanation as to *how* Doe breached the contract. Under the Code of Conduct, Doe was prohibited from engaging in "physically or verbally abusive conduct," (Counterclaim, Doc. 13, #88) a prohibition Doe violated, according to the League Defendants, by engaging in "continuing and repeated harassing and threatening conduct." (*Id.* at #70). The League Defendants' allegations of breach thus do little more than restate the Code of Conduct's requirements using slightly different wording. To survive a motion to dismiss, the League Defendants must do more than allege that Doe violated the Code of Conduct by, essentially, violating the Code of Conduct.[11] The League Defendants must provide at least *some* specifics as to those allegations—what was said, when, to whom, etc.—that would move the allegations beyond "cursory." *Smith v. Nationstar Mortg., LLC*, 756 F. App'x 532, 536 (6th Cir.

---

[11] The League Defendants' Opposition to Doe's Motion to Dismiss adds little clarity as to the factual basis of its allegations, stating only that Doe "engag[ed] in abusive conduct, scorched earth pressure tactics, threats and coercion, and refusal to lawfully cooperate with league administrators, among other issues." (Doc. 21, #137).

2018). Because the League Defendants fails to apprise Doe of any factual basis for their Counterclaim, the Court finds that it must be dismissed.

While that would ordinarily be the end of the matter, in their Opposition to Doe's Motion to Dismiss, the League Defendants also request that the Court grant them "leave to amend their Counterclaim to provide any details the Court should deem missing from the Counterclaim." (Doc. 21, #139). On that front, the Sixth Circuit has observed that "[a] request for leave to amend almost as an aside, to the district court in a memorandum in opposition to the defendant's motion to dismiss is … not a motion to amend." *La. Sch. Emps. Ret. Sys. V. Ernst & Young, LLP*, 622 F.3d 471, 486 (6th Cir. 2010) (internal quotation marks omitted). Had the League Defendants

> filed a motion to amend [their counterclaim] prior to th[e] Court's consideration of the motion[] to dismiss and accompanied that motion with a memorandum identifying the proposed amendments, the Court would have considered the motion to dismiss in light of the proposed amendments to the [counterclaim] …. Absent such a motion, however, [Doe] was entitled to a review of the [counterclaim] as filed pursuant to Rule 12(b)(6). [The League Defendants] were not entitled to an advisory opinion from the Court informing them of the deficiencies of the [counterclaim] and then an opportunity to cure those deficiencies.

*Id.* (quoting *Begala v. PNC Bank, Ohio, N.A.,* 214 F.3d 776, 784 (6th Cir. 2010)).

Thus, because the League Defendants did not file a motion to amend, the Court cannot consider their request. That being said, the Court grants the League Defendants thirty days from the issuance of this Order in which to file a motion to amend, attaching a copy of their proposed counterclaims.

24

## CONCLUSION

For the foregoing reasons, the Court (1) **GRANTS** the School Defendants' Motion to Dismiss (Doc. 10) and **DISMISSES** all claims against Defendants Mariemont City School District, Steven Estepp, and Lance Hollander, and (2) **GRANTS** Doe and W.W.'s Motion to Dismiss (Doc. 16) and **DISMISSES** Goodyear and CPYVL's Counterclaims against them (Doc. 13). Any party who believes it can cure the pleading deficiencies identified above shall have thirty days in which to file a motion for leave to amend (either the Complaint (Doe)), or the counterclaims (CPYVL and Goodyear)), attaching a copy of the proposed pleading.

      **SO ORDERED.**

February 4, 2022
**DATE**

**DOUGLAS R. COLE**
**UNITED STATES DISTRICT JUDGE**